CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

OCT 24 2005

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 3:04-CR-00047 |
| v. | MEMORANDUM OPINION |
| LOUIS ANTONIO BRYANT ET AL. *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the court on Defendant Louis Bryant's Motion to Suppress evidence and accompanying memoranda, which was joined by Co-Defendant John Bryant.

A hearing on the motion was held on October 17, 2005, at which the parties presented witness testimony and Defendants offered an additional ground for suppression. For the reasons stated below, the Court will deny Defendants' motion on all grounds.

## BACKGROUND

On December 30, 2003, a Charlottesville police officer conducting a routine traffic stop discovered a firearm in the vehicle. [Tr. 17-18]. The driver of the vehicle was identified as co-Defendant Detric Cabell, who had a prior felony conviction and was thus arrested and charged with possession of a firearm by a convicted felon. [Exh. 1; Tr. 18]. The arresting officer recorded the serial number of the gun. [Exh. 1]. At the time of the traffic stop, Cabell was on "probation or parole and supervision." [Tr. 18].

1

On January 6, 2004, a Charlottesville resident reported to the Albermarle County Police that three guns had been stolen from his residence and that he had first noticed the guns were missing on December 22, 2003. [Exh. 1; Tr. 17]. The resident furnished the police the serial number, make and model of one of the firearms, which matched that of the firearm recovered during Cabell's December 30 arrest. [Tr. 16-17]

On January 15, 2004, Detective Philip Giles of the Albermarle County Police Department filed an Affidavit for Search Warrant ("First Affidavit") to search 913 Charlton Ave. for the other two missing guns.[1] [Tr. 18; Exh. 1]. To establish probable cause for the search, Detective Giles recited the above events; noted that "Detric Cabell's address has been confirmed through probation and parole (9th District office)"; and averred that in his experience in law enforcement, it is inferred that a person in recent possession of a portion of stolen property is presumed to possess the remaining stolen property and to have committed the theft.[2] [Exh. 1].

Giles later testified at the hearing that he could not remember which probation and parole officer confirmed Cabell's residence or whether he personally called the officer, [Tr. 20], but that

---

[1] The warrant affidavit specified the make, model, and appearance of the two firearms, and requested authority to search for any and all ammunition; firearm components and related items; any and all receipts related to sales and purchases of firearms and ammunition; boxes for firearms; and holsters. [Exh. 1].

[2] At the hearing and in his memoranda of law supporting his motion to dismiss, Defendant Louis Bryant argued that the First Affidavit was facially insufficient to show probable cause for the search. The Court agrees that the affidavit the Government furnished the defense at bates stamped pages 3013 - 3015 was blatantly insufficient to show probable cause. However, it was obvious that the second page of the affidavit was missing from the Government's production. At the hearing, the Government explained that the missing page was on the second side of a two-sided form and had not originally been copied. [Tr. 14]. The Government proffered and the Court accepted into evidence the complete First Affidavit as Exhibit 1. After Defendant's counsel inspected it and consulted with his client, Defendant abandoned this particular grounds for suppression. [Tr. 15].

he customarily made these calls himself. [Tr. 21]. He further testified that he did not believe he saw any written material supporting the officer's address confirmation. [Tr. 22].

Keith Bryant, Defendant Louis Bryant's uncle, John Bryant's brother, and a co-owner with John Bryant of the Charlton Ave. residence, [Tr. 82], testified that he customarily stops by the residence two to three times every day. [Tr. 77, 85]. He stated that he had only seen Cabell there as a social visitor two or three times in the previous month,[3] [Tr. 80], and that Cabell did not reside or keep any clothes or property there. [Tr. 80]. Keith Bryant further testified that John Bryant and Antonio Bryant both reside at 913 Charlton Ave. [Tr. 78, 82].

A search warrant ("First Warrant") was issued and a search conducted the same day the First Affidavit was filed, on January 15, 2005. [Exh. 1].

Detective Giles and Detective Fields both participated in the execution of the First Warrant and were present when the search team first arrived at the residence. [Tr. 24-25, 43]. Detective Fields is a police officer and a JADE (Jefferson Area Drug Enforcement/ Anti-Terrorism) Task Force member.[4] [Tr. 55].

Both detectives were questioned about how the search team gained entry to the Charlton Ave. residence. Detective Giles first testified that he thought Co-Defendant John Bryant let the search team in through the front door. [Tr. 25].[5] Later, Giles clarified that he thought John

---

[3] Keith Bryant also said that in previous months Cabell had not appeared at all because he had been incarcerated. [Tr. 85].

[4] The search team consisted of an unspecified number of other Albermarle County Detectives and JADE Task Force members. [Tr. 57].

[5] Detective Giles testified that he believed that a middle-aged black male was also present during execution of the search warrant. [Tr. 31].

3

Bryant was on the porch when the team arrived. [Tr. 38]. He could not remember whether the person on the porch informed the team that Mr. Cabell did not reside there. [Tr. 38]. Detective Fields could not remember how the team entered the residence, but testified that he believed the team did not knock down the door and that a key to the residence "may have been obtained." [Tr. 43-44]. Detective Fields did not think John Bryant was present when the search team first arrived and initially did not remember whether any non-police person was present during the search, [Tr. 49], though he later testified that he saw a black male in an upstairs room containing studio equipment. [Tr. 54-55]. Keith Bryant testified that he was on the porch of the Charlton Ave. residence at the time the search team arrived. [Tr. 79].

The search proceeded throughout the entire house. [Tr. 24, 46]. Giles noted that one gun was found by another detective on a screened porch, [Tr. 26], and that ammunition was found in a living room sofa cushion. [Tr. 27]. Giles himself found a "stack" of papers that appeared to belong to Cabell and seized a couple of them for the purpose of showing Cabell's affiliation with the residence. [Tr. 28-30]. Only one of the seized papers showed an address, which was not 913 Charlton Avenue. [Tr. 40].

During the search, a team member found a plastic bag containing numerous individually wrapped rocks which Detective Fields testified appeared to be crack cocaine and was confirmed to be cocaine by a field test conducted at the Charlton Ave. residence. [Tr. 41-42]. Fields decided to apply for another warrant ("Second Warrant") to search for narcotics-related items, and thus left the scene. *Id.* Citing the appearance of the rocks in the plastic bag and the field test results, he succeeded in obtaining a warrant authorizing a search of 913 Charlton Ave. for various drug paraphernalia. [Tr. 41-42; Exh. 2]. Questioned about the execution of the Second

4

Warrant, Fields testified that he was not sure who among the search team knew what specific items the Second Warrant authorized to be seized but that it was "generally known" among the team that it related to the prior finding of narcotics. [Tr. 51, 53].

The testimony was not clear as to whether the initial search ever stopped before execution of the Second Warrant began. [Tr. 32-33; Tr. 50]. Giles testified that the second gun was not found before the Second Warrant was obtained, and, indeed, was never found. [Tr. 26, 34-35].

Special Agent John Stolz of the Federal Bureau of Alcohol, Tobacco and Firearms testified about a third search of the Charlton residence which took place on July 21, 2005, pursuant to a warrant obtained on July 19, 2005. [Tr. 65-66; Exh. 3]. Stolz explained that two witnesses informed him that Defendant Louis Bryant ran a recording business out of his Charlton Ave. residence and had told them that his rap lyrics depicted real life events. [Tr. 60-62]. One of the witnesses also described a promotional DVD Louis Bryant appeared in that he intended to use to market one of his music recordings. [Tr. 63]. The witness said that the DVD would be found in a safe in Louis Bryant's recording studio, and the witness described the safe in some detail. [Tr. 63-64]. On the strength of the witness reports and his own investigation,[6] [Tr. 62, 65], Stolz obtained the Third Warrant, which authorized a search for CDs, magnetic tapes, DVDs, videos, reel to reel tapes, film, vinyl albums, written song lyrics, and the safe. [Exh. 3]. In a return report inventorying the items seized, Stolz listed CDs, a videotape, a camera, "miscellaneous music lyrics/ documents," a pipe with suspected marijuana residue and suspected marijuana seeds and stems, a firearm, ammunition, and a receipt for the firearm. [Exh. 3].

---

[6] Stolz testified that prior to submitting the Third Affidavit, he listened to some of Louis Bryant's recordings and found that they contained numerous references to illegal activity.

5

## DISCUSSION

Defendants seek to suppress various evidence on numerous grounds. They argue that the First Warrant was not supported by probable cause because the First Affidavit contained insufficient facts to establish Detric Cabell's connection to the Charlton Avenue residence. Next, Defendants appear to attack the veracity of Detective Giles, who applied for the First Warrant. Defendants also urge the Court to find the initial January 15 search invalid because the government has not shown that the search team knocked and announced prior to entering.[7] Defendants further argue that all of the searches and seizures exceeded the scope permitted by the warrants. Finally, Defendants argue that the Second Warrant was unconstitutionally overbroad.[8]

---

[7] Defendants further urge that items found in subsequent searches must be excluded as unlawful fruits if the court finds the first search unlawful, per *Wong Sun v. United States*, 371 U.S. 471 (1963).

[8] Defendant also argued in his First and Second Supplemental Memoranda of Law that the magistrates who issued the warrants were without authority because Virginia law does not require that magistrates be lawyers or have any law school education. [1st Supp. at 2; 2d Supp. at 6 (citing Va. Code. § 19.2-37)]. Defendant did not raise this argument at the hearing, and the Court finds it be without merit. The Fourth Amendment does not require that magistrates have formal legal training. *U.S. v. Neerng*, 194 F.Supp.2d 620, 624-25 (E.D. Mich. 2002.). Instead, the Supreme Court has insisted only that probable cause determinations be made by judicial officers who are independent of the police and prosecution and capable of determining probable cause. *Shadwick v. City of Tampa*, 407 U.S. 345, 350-51 (1972); *Johnson v. United States*, 333 U.S. 10, 14 (1948); *cf. Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("[S]earch and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.'"). Defendant does not challenge the magistrate's neutrality or suggest that he was incapable of making a probable cause evaluation.
    Defendant also vaguely argued for the first time at the hearing that the search was invalid because the size and composition of the search team—which included members of a drug task force— assembled to execute a mere search for guns reveals that the initial search was pretextual. [Tr. 91, 92]. This argument has no merit, as the Supreme Court has emphasized that the validity of Fourth Amendment searches and seizures are to be evaluated for objective reasonableness, and that an officer's subjective motives are irrelevant. *Horton v. California*, 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of

6

### (a) Sufficiency of First Affidavit To Show Detric Cabell's Connection to the Charlton Avenue Address

The Fourth Amendment prohibits "unreasonable searches and seizures" and the Warrants Clause provides that "no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is a fluid concept that turns on the assessment of probabilities in particular contexts. *Id.* at 232. A reviewing court's role is limited to ensuring that the magistrate had a "'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990).

The sole information in the First Warrant connecting Cabell to 913 Charlton Ave. was Detective Giles' handwritten notation that Cabell's address had been confirmed with a probation and parole officer.[9] Defendant argues that this information was insufficient to enable the

---

objective standards of conduct...The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement); *see also Whren v. U.S.*, 517 U.S. 806, 813 (1996)("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").

[9] The "probation and parole officers" of the Virginia Department of Corrections supervise and assist persons placed on probation or released on parole. Va. Code §§ 53.1-140, 145.

7

magistrate to conclude that 913 Charlton Ave. was the correct search target.

Detective Giles' testimony reveals that the notation in his affidavit concerning Cabell's address was hearsay. Giles admitted that he did not view the contents of Cabell's parole and probation file, but rather relied on an over-the-phone address confirmation by an officer who alone accessed the file's contents. Further, the address information is double hearsay if the address was supplied by Mr. Cabell himself without further verification.[10] Nevertheless, the magistrate had ample reason to trust the "veracity" and "basis of knowledge" of the hearsay supplier(s). Virginia parole and probation officers serve as officers of the court. Va. Code § 53.1-143. Before assuming this role, they are required to subscribe to an oath of office, swearing to uphold the Constitution and to faithfully and impartially discharge their duties. Va. Code § 49-1. This oath provides an important indicium of reliability. Further, even if the officer relied on Cabell's self-reported address, this second level of hearsay would have its own indicium of reliability. Virginia's model "Conditions of Parole" require parolees to be truthful and to change their address only with the permission of parole officers.[11] Virginia law authorizes parole and probation officers to arrest any parolee or probationer for violation of the terms of probation or parole pending a hearing. Va. Code § 53.1-145. Thus, even if the address information was reported by Mr. Cabell without further verification, Mr. Cabell had a strong incentive to correctly report his address.

---

[10] The Government did not present evidence as to the identity of Cabell's probation and parole officer or how such officers typically collect and verify address information.

[11] *See* Virginia Parole Board, *Parole Manual*, 54 (1997), *available at* http://www.vadoc.state.va.us/about/paroleboard/Parole_PolManual.pdf. Standard conditions of probation appear to be very similar if not identical. *See, e.g., Allison v. Commonwealth*, 579 S.E.2d 655, 656 (Va. Ct. App. 2003).

As for the "basis of knowledge" of persons supplying hearsay information, Mr. Cabell would best know his own place of residence. Further, his probation and parole officer would have the resources and, indeed, the obligation to collect address information in the performance of his duties. Finally, as far as Giles' veracity is concerned, there is "a presumption of validity with respect to the affidavit supporting [a] search warrant," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), and Defendants have offered no reason why the magistrate would not have relied on this presumption. Given the reliability and basis of knowledge of the supplier(s) of hearsay information, and the presumption of an affiant's truthfulness, the Court finds that the magistrate had a substantial basis for concluding that Mr. Cabell lived at 913 Charlton Avenue.

### (b) Defendants' Challenge to the Veracity of Detective Giles' Affidavit

In *Franks v. Delaware*,[12] the Supreme Court held that a defendant may challenge the validity of a search warrant issued in reliance upon an affidavit containing deliberately or recklessly false or misleading information. *Id.* at 164-72. A *Franks* challenge is not aimed at the truthfulness of information in the affidavit *per se*—which may consist entirely of informant or other hearsay information that later proves to be false—but rather the truthfulness of the affiant. *Id.* at 165.

A defendant is entitled to an evidentiary hearing ("*Franks* hearing") on the affiant's truthfulness or reckless disregard for the truth *only* if he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the

---

[12] 438 U.S. 154 (1978).

9

truth, was included by the affiant in the warrant affidavit."[13] *Id.* at 155-56. The defendant's attack must be "more than conclusory" and contain "allegations of deliberate falsehood or of reckless disregard for the truth ... accompanied by an offer of proof....Allegations of negligence or innocent mistake are insufficient." *Id.* at 171-172.

Defendants failed to make the "substantial preliminary showing" necessary to entitle them to a *Franks* hearing. Defendants only alleged in conclusory fashion that the searches were unlawful because "the warrants were obtained with the use of false and/or unreliable evidence." [1st Supp. at 2]. Nowhere did Defendants allege that Detective Giles made a knowing and intentional false statement or spoke with reckless disregard for the truth. Instead, Defendants merely intimated through questioning that Giles should have done more to verify the probation and parole officer's information, [Tr. 21-22], which is at best an implied allegation of negligence. Defendants also did not make a sufficient offer of proof. The summary of predicted testimony [2d Supp. at 3] and the actual testimony of Keith Bryant elicited by Defendants tends only to show that Mr. Cabell did not in fact live at 913 Charlton Ave. Though such testimony would tend to show that the *information* in the affidavit was false, it is not tantamount to an allegation that Detective Giles knowingly and intentionally, or with reckless disregard of the truth, misreported the address information.

### (c) Was the Search Team Required to Knock and Announce?

Defendants also claim that the initial search was invalid because the search team failed to knock and announce prior to their entry as required by *Wilson v. Arkansas*, 514 U.S. 927 (1995).

---

[13] In addition, but not at issue here, a defendant must show that the allegedly false statement was necessary to the finding of probable cause. *Id.* at 156.

10

The testimony is not clear on how the search team entered the residence. Keith Bryant did not testify as to whether he gave or denied permission to enter, but merely stated that he was on the porch when the search team arrived. Detective Giles remembers John Bryant being on the porch and permitting the officers to enter. Detective Fields does not recall anyone being on the porch but did not think entry was forced. The preponderance of the evidence thus shows that a co-owner and/or resident was on the porch when the team arrived, and that entry was not forced.

*Wilson* clearly states that not every entry need be preceded by an announcement and that the knock and announce requirement is governed by the "flexible requirement of reasonableness." *Id.* at 934. The purpose of the knock and announce rule is to (i) protect the privacy interests the occupants may have in the residence; (ii) provide the occupants an opportunity to open the door voluntarily so as to avoid unnecessary damage to the property that could result from forced entry; and (iii) prevent occupants from initiating defensive measures against the police in a mistaken belief that the person entering is an unlawful intruder. *Id.* at 935-46; *U.S. v. Antrim*, 389 F.3d 276 (1st Cir. 2004). As the evidence shows that entry was not forced and that a co-owner and/or a co-resident was on the porch (who could have waived certain privacy interests of any co-residents within[14]), none of these interests would have been served by knocking and announcing. The Court declines to hold that the search team was required to engage in the hollow formality of knocking and announcing under these circumstances.

---

[14] *Cf. United States v. Matlock*, 415 U.S. 164, 169 (1974) ("[The] voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant.").

11


### (d) Defendants' Claim That the Search and Seizures Exceeded the Warrants' Scope

Defendants argue that the January 2004 and July 2005 searches and seizures exceeded the scope of the authorizing warrants.

With respect to the third, July 2005 search, Defendant argues that the Government improperly seized numerous items, including a disposable camera, firearm and receipt for its purchase, and suspected marijuana pipe and marijuana seeds. The Government has represented that none of this evidence is relevant to the case and will not be presented at trial. [Tr. 90]. Thus, the Court need not address whether these items were properly seized.

With respect to the January 2004 searches, Defendants make much of the fact that neither Detective Giles nor Fields could testify with certainty whether there was a stopping point between the execution of the First and Second Warrants, but fail to explain the constitutional significance of this point. The search team was well within its constitutional right to continue a reasonable search for the second gun—which was never found—after the first gun was found at 7:05 pm, even if team members secretly harbored a desire to uncover further evidence of narcotics activity.[15] *See Horton v. California*, 496 U.S. 128, 130 (1990). If, on the other hand,

---

[15] Even if the initial search was ongoing when Fields returned with the Second Warrant, there is no evidence that it had been unreasonably prolonged. Detective Giles testified from a writing in his file that the first gun was found at 7:05 p.m., after which, naturally, the search for the second gun continued. [Tr. 34-35]. The Second Affidavit and Second Warrant both appear to be dated 7:00 p.m., January 15, 2004 (though the handwriting on the Second Warrant is difficult to read and might say 7:10 p.m.). [Exh. 2]. After obtaining the Second Warrant, Detective Fields brought it back from his office to Charlton Ave. He could not remember when he left or returned, but estimated that 30-45 minutes elapsed between his departure and return. [Tr. 50]. Thus, the evidence shows less than an hour passed after the first gun was found and before Fields returned.

Defendants also present no evidence that the initial search had unlawfully turned into generalized search for narcotics-related items. However, even if the initial search had

12

the initial search had ceased before the arrival of the Second Warrant and the police were "standing around" waiting for it to arrive, their actions were also constitutionally permissible in light of the circumstances. *Cf. Illinois v. McArthur*, 531 U.S. 326 (2001).

Defendants claim that the search team exceeded the scope of the First Warrant by field testing the contents of the plastic bag that appeared to contain rocks of crack cocaine. The seizure of the bag itself occurred during a valid ongoing search for firearms, and in light of Detective Fields' narcotics expertise and testimony that its appearance was incriminating, was thus permissible under the plain view doctrine. [Exh. 2]. *See Horton,* 496 U.S. at 135-36 (1990); *Arizona v. Hicks,* 480 U.S. 321, 326 (1987). The incriminating character of the plastic bag, in turn, gave the officers probable cause to conduct the field test. *Cf. Hicks*, 480 U.S. at 326 (warrantless search of an item is permissible under "plain view" doctrine if that doctrine would have sustained a seizure of the item).

Therefore, none of the searches or seizures of items relevant to this case exceeded the scope of the warrants.[16]

### (e) Did the Second Warrant Satisfy the Particularity Requirement?

Finally, Defendant argues that the Second Warrant violated the Fourth Amendment's particularity requirement. [2d Supp. at 5]. The warrant authorizes a search for "[c]ocaine, U.S.

---

impermissibly shifted from gun- to narcotics-related items before the arrival of the Second Warrant, the inevitable discovery doctrine would clearly apply, given that the Second Warrant was obtained at 7:00 or 7:10 p.m. and was in transit. *See Nix v. Williams*, 467 U.S. 431, 443 (1984).

[16] Defendants asserted that items seized during the execution of the Second Warrant went beyond its scope, [2d Supp. at 6], but to this date has not informed the Court what these items are or why they fall beyond the warrant's scope.

13

currency, firearms, ledgers, papers and documents depicting illegal narcotics transactions, photographs, scales, packaging material, video tape recordings, cell phones pagers and any other items relating to the sale or use of narcotics." [Exh. 2].

The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a "general, exploratory rummaging." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "This requirement ensures that the search is confined in scope to particularly described evidence relating to a specific crime for which there is probable cause." *U.S. v. Oloyede*, 982 F.2d 133, 138 (4th Cir. 1992). The degree of specificity required will "vary according to the circumstances and the type of items involved." *U.S. v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979) (quoting *United States v. Davis*, 542 F.2d 743, 745 (8th Cir. 1976)).

Although the language describing the list of items to be seized is not a shining example of grammatical clarity, the phrase "relating to the sale or use of narcotics" is most logically read to modify the entire list of "photographs, scales, packaging material, video tape recordings, cell phones pagers" authorized to be seized. The Second Warrant was thus *more* particular than another that has been upheld under existing precedent. *See U.S. v. Ladd*, 704 F.2d 134, 136 (4th Cir. 1983) (upholding as sufficiently particular a warrant describing the items to be seized as "those relating to 'smuggling, packing, distribution and use of controlled substances'").

## CONCLUSION

None of the arguments given by Defendants in support of their Motion to Suppress has support in the law or in the facts. Their motion will therefore be DENIED in an order to follow.

14

It is so ORDERED.

The Clerk of the Court is hereby directed to send a copy of this Opinion to all counsel of record.

ENTERED: ___/s/_____
U.S. District Judge

Oct 24, 2005
Date